# 3D MARINE
### Marine Consultants and Surveyors

## 3D MARINE USA, INC.
12411 Donna Drive, Houston, Texas 77067
Tel (281) 444-9495  (24 hours)  Fax (281) 444-8874
E-mail: firm@3dmarine.com

June 23, 2016

Our Ref. No. HAR/12395/DHS/16L

Harris and Rufty, LLC
650 Poydras Street
Suite 2710
New Orleans, Louisiana 70130

Attn:  Mr. Rufus C. Harris, III

Re:   The matter of M&M Wireline & Offshore Services, LLC , as owner of the M&M 102,
      petitioning for exoneration from, or limitation of liability

Dear Sir,

Further to the request of Harris and Rufty, LLC, 650 Poydras Street, Suite 2710, New Orleans,
Louisiana 70130; 3D Marine Consultants have reviewed the following documentation
concerning the above captioned case:

1. Deposition Testimony of Beaux Andrew Cormier, dated March 28th 2016;
2. Deposition Testimony of Albert E. Osterholm, dated April 26th , 2016;
3. Deposition Testimony of Martin Earl Quiram, dated April 14th 2016;
4. Deposition Testimony of Shaun Levasseur, dated May 16th, 2016;
5. Plaintiff's expert witness report by Bob Borison of Total Safety Services, dated May 27th 2016;
6. Condition and Valuation survey report of "M&M 102", issued by Perry Beebe, dated September 25th 2015;
7. Saratoga Resources Accident Report dated November 30th 2014;
8. U.S. Coast Guard Certificate of Documentation for M&M 102, issue date April 11th 2014;
9. Flatboat photographs;
10. M&M Wireline Field Ticket dated November 30th 2014;
11. Photographs of M&M 102;
12. M&M Wireline personnel file for Beaux Andrew Cormier; and
13. Photographs of the M&M 102 and the Saratoga Resources flatboat taken on Wednesday June 1st 2016.

3D Marine also attended on board the M&M 102 on June 1st 2016 while the vessel was on
location in the Saratoga Resources, Grand Bay Field near Venice Louisiana.



Captain David G. Marsh
F.N.I.

L. Keith Reay
B.Sc(Eng)., C.ENG.,
MIMARE, MCMS, MIEE

David H. Scruton
Master Mariner
B.Sc., M.C.I.T.



EXHIBIT
4-1

After review of the above documentation and our attendance on board the M&M 102, we report as follows:

Brief Description of the Incident

In November 2014, Mr. Beaux Andrew Cormier (Cormier) was employed as a Wire-line Helper/ Deckhand by M&M Wireline and Offshore Services (M&M) and assigned to work aboard the self-propelled wireline spud barge " M&M 102".

M&M 102 had been contracted by Saratoga Resources to work in that company's oil field in close proximity to Venice, Louisiana, providing wireline and other associated services as required.

The crew of M&M 102 on that day consisted of Mr. Shaun Levasseur, who was Captain, and Mr. Cormier, who was his assistant.

At the start of the shift at 6:00 a.m. on 30th November 2014, the crew of M&M 102 had been tasked with the job of proceeding to Tank Battery No. 13 in the Saratoga Grand Bay Field and pumping oil out of a "stock tank" into a Saratoga pipeline.

In order to accomplish this, a portable pump and flexible hoses were placed aboard M&M 102. The hoses were connected to valves and fittings on the "stock tank" to the portable pump and to a valve controlling the inlet to the Saratoga pipeline.

The portable pump was placed aboard M&M 102 and the flexible hoses were run onto the platform at Tank Battery No. 13 in the Grand Bay Field and connected to the respective valves for the stock tank and pipeline.  At that time, M&M 102 was lying with her starboard side alongside the Tank Battery No. 13 platform.

Pumping then commenced with Mr. Levasseur operating the pump on the M&M 102 and Mr. Cormier operating valves on the platform at the Tank Battery No. 13.

At the start of the day, the water level at the Tank battery No. 13 platform was such that the M&M 102 could lie next to the platform.  Personnel could embark and disembark from the M&M 102 simply by stepping on and off the deck.

During the course of the day, the tide level dropped, exposing a mudflat adjacent to the platform, resulting in M&M 102 to move away from the platform, leaving a gap that was estimated at between approximately 5 and 10 feet wide.

At the end of the day shift, at approximately 1745 hours, Mr. Albert Osterholm, who was the Saratoga Resources Field Coordinator, arrived on site in an outboard powered aluminum flatboat owned and operated by Saratoga Resources.

Mr. Osterholm, who was the sole operator of the flatboat, testified that he came to pick up Mr. Cormier from the M&M 102 in order to ferry Mr. Cormier back to the Saratoga Resources field bunk house, otherwise known as the White House.

Mr. Osterholm testified that he put the flatboat up to the stern of M&M 102, such that the flat bow of the boat closely abutted the flat stern of M&M 102, and Mr. Cormier boarded the flatboat.

The flatboat then reversed away from the stern of M&M 102 and idled along parallel to the port side of the barge. As the flatboat was passing the port side of the barge, Mr. Cormier, whom we understand had forgotten something jumped from the bow deck of the flatboat towards the deck of M&M 102, a distance of approximately three (3) feet.

Mr. Cormier landed on the deck of the barge with both feet, but lost his balance, attempted to jump back onto the flatboat and fell onto the foredeck of the flatboat, cutting his left leg on the side of the boat.

Mr. Levasseur and Mr. Cormier's testimonies indicate that the flatboat was ferrying Mr. Cormier from the Tank Battery No. 13 Platform across to M&M 102.

Mr. Cormier testified that Mr. Osterholm closely abutted the square  bow of the flatboat against the port side of the M&M 102 barge, then instructed Mr. Cormier to disembark.

Mr. Cormier also testified that as he was getting off the flatboat onto the barge, a gap opened up between the two (2) vessels, he lost his balance as a result of a combination of an apparent approximately three (3) feet vertical height that he had to step and the widening gap between the vessels.

Mr. Cormier attempted to jump back onto the foredeck of the flatboat and fell onto the foredeck of the flatboat, cutting his left leg.

Mr. Levasseur's testimony is that the bow of the flatboat was closely abutted up to the bow of M&M 102 and that Mr. Cormier attempted to step aboard from there and fell.

After the incident, Mr. Cormier was taken to the White House, where first aid was administered, and then he was taken to the hospital for medical treatment.

The incident occurred at approximately 1745 hours on 30th November 2014.

Mr. Cormier continued to work for an additional approximately 3-1/2 months and subsequently retained an attorney and filed suit against M&M for the incident and alleged injuries to his back.

Observations

On Wednesday June 1st, 2016, the undersigned attended on board Barge M&M 102 while the vessel was lying on location at the Saratoga Resources Grand Bay field near Venice, Louisiana. The Saratoga flatboat that was involved in the alleged incident was also inspected.

The purpose of our attendance on board M&M 102 and inspection of the Saratoga flatboat was associated with the incident and injuries alleged to have been sustained by Mr. Beaux Andrew Cormier on 30th November 2014.

Our inspection of M&M 102 was conducted in the presence of the following personnel:

Mr. Mike Demarcay            M&M Wireline; Captain of M&M 102

Mr. Cody Barrois             M&M Wireline; Wireline helper

Ms. Adrienne H. Hanna        Paralegal with Harris and Rufty LLC

Details of our observations are as follows:

Vessel Particulars - M&M 102

| | |
|---|---|
| Vessel Name: | M&M 102 |
| Official No: | 508150 |
| Built: | 1967 in Houma, Louisiana |
| Gross Registered Tonnage: | 53 |
| Length overall: | 49 feet |
| Breadth: | 20 feet |
| Depth: | 4.9 feet |
| Draft observed: | 2.1 feet |
| Freeboard observed: | 2.8 feet |
| Owner | M&M Wireline and Offshore Services |

At the time of our inspection, M&M 102 was lying on an even keel with the forward and aft drafts the same. It was understood that during operation there was very little variation in the drafts, trim and list of the vessel.

M&M 102 is a flush deck, self-propelled wireline barge fitted with three (3) spuds; one on the centerline of the transom aft, and one each on the port and starboard forward corners. The spuds are controlled by hydraulic winches.

The vessel has one flush deck and is provided with a wheelhouse aft. The engine compartment is below deck forward of the wheelhouse and is accessed via a hinged hatch. The steering gear compartment in the stern also contains a free standing fuel tank.

The barge is provided with two (2) tier handrails around the stern and extending along the port and starboard sides, a distance of approximately 12 feet. A 5-ton hydraulic EBI pedestal mounted jib crane is mounted on the port side main deck midships.

M&M 102 was inspected externally and found in good overall operational condition.

Saratoga Resources Flatboat

The Saratoga Resources flatboat is a 17foot aluminum hull center console vessel fitted with a 90 horsepower Yamaha outboard engine. The boat has a raised foredeck flush with the top of the side of the hull (gunwhale) and the aft section is open. The raised foredeck is composed of diamond plate with good underfoot properties.

| | |
|---|---|
| Serial No.: | AWLCO651G708 |
| Louisiana Registration No.: | 9255FR |
| Length overall: | 17feet |
| Breadth: | 6.25feet |
| Depth: | 2.3 feet |
| Observed draft: | 0.66 feet |
| Observed freeboard: | 1.66 feet |

Note: With the outboard engine in the lowered operational position, the boat lay on an even keel with no appreciable list or trim.

The vertical distance between the foredeck of the flatboat and the deck of M&M 102 was measured by the undersigned at 14 inches as illustrated in the attached photographs. Note: There was no significant difference between the height of the flatboat foredeck and the main deck of M&M 102 at any location on the barge hull as she lay on an even keel.

In our presence, the flatboat pushed up to the side of M&M 102. The undersigned and Ms. Adrienne Hanna of Harris & Rufty, were able to comfortably step up and down from the foredeck of the flatboat onto the deck of M&M 102, with ease and without difficulty.

Method and Analysis/Comments

From review of the above detailed depositions and documentation, as well as inspecting the M&M102 and the Saratoga Resources flatboat, and from many years as a Ship's Officers and Captain, and subsequently as a Marine Surveyor and Consultant, we have analyzed the facts of this case and compared them with standards within the industry and comment as follows:

Firstly, we note that Mr. Beaux Andrew Cormier considered himself an experienced deckhand, and he had spent many years serving on board commercial vessels. Mr. Cormier testified, on page 17 of his deposition, that he had been employed as a deckhand by Broussard Brothers, Jade Marine, Oceaneering, and he had also worked offshore.

When Mr. Cormier applied for employment with M&M on November 10th 2014, he signed the declaration that the information he provided was truthful and complete.

Mr. Cormier subsequently underwent a pre-employment physical examination during which time he completed a "General Physical Form" dated November 10th 2014. On that form Mr. Cormier checked that he did not have frequent backaches, neck or lower back injury.

To the contrary, however, Mr. Cormier testified, on page 26 of his deposition, that he had back problems between 2002 and 2005. He had previously visited Abbeville General Hospital and was told his back pain was caused by muscle spasms. On page 27 of his deposition testimony, Mr. Cormier further testified that he had visited a chiropractor for help on two prior occasions.

On page 43 of his deposition, Mr. Cormier testified that he visited Abbeville General Hospital in 2005 associated with problems with his back, which was associated with *"injured on the job one month ago pushing pipe"*.

Further, on page 26 of his deposition it details that during the time Mr. Cormier was incarcerated at the Allen Correctional Facility, he woke up one morning with shooting pains down his left leg. He saw a doctor for the problem on February 26th 2013. He saw the doctor at Allen Correctional again on March 1st 2013 for pain in his leg.

Consequently, it appears evident to the undersigned that Mr. Cormier had back problems prior to the incident in question, although he did not inform M&M Wireline at the time he applied for employment.

Mr. Cormier further testified, between pages 57 and 62 of his deposition, that his alleged injuries were associated with an incident that occurred whilst he was being ferried in the flatboat driven by Mr. Osterholm between the Tank Battery No. 13 Platform and M&M 102 barge.

We note that Mr. Cormier testified that Mr. Osterholm maneuvered the flatboat up to the port side of the barge, pushed the flat bow of the boat up against the side of the barge, held it there with the outboard in gear, and instructed him to get off.

Mr. Cormier testified that the vertical distance between the raised foredeck of the flatboat and the main deck of M&M 102 was approximately three (3) feet. As Mr. Cormier went to step up from the flatboat onto M&M 102 a gap opened between the flatboat and the barge causing him to lose his balance due to a combination of the vertical height difference between the decks and the gap between the two (2) vessels. At that time, Mr. Cormier attempted to jump back onto the foredeck of the flatboat, but landed on his stomach on the foredeck on the flatboat, cutting his left leg.

From our personal observations and information obtained while inspecting M&M 102 and the flatboat, the height differential was approximately 14 inches and not 3 feet as alleged.

However, on the assumption that there was a 3 foot height differential between the two (2) vessels, as alleged of which there is no evidence to support, or if Mr. Cormier felt that the his path to egress the flatboat was unsafe for any other reason, then Mr. Cormier had every opportunity to exercise the industry standard practice and procedure of "Stop Work Authority".

All crewmembers are typically well aware of "Stop Work Authority", which is typically taught at the onset of their careers. "Stop Work Authority" can be implemented anytime, anywhere, by anyone, for any reason.

All the worker simply needs to in the event that they believe there is an unsafe condition , or assistance is needed, is to stop work, report the situation to a supervisor, and not continue to work until the situation is rectified or assistance obtained.

There is evidently some conflict between the various testimonies regarding the sequence of events. Between pages 36 and 48 of his deposition, Mr. Osterholm testified that he picked up Mr. Cormier from the stern of M&M 102 to take him back to the Saratoga Bunk house facility as it was the end of the shift.

As Mr. Osterholm backed the flatboat away from the stern of M&M 102, he was idling the boat parallel to the port side of the barge when Mr. Cormier advised that he had forgotten something and jumped between the fore deck of the flatboat onto M&M 102. The horizontal gap between the side of the flatboat and the side of M&M 102 was approximately three (3) feet.

According to Mr. Osterholm, Mr. Cormier landed on the deck of M&M 102 with both feet, lost his balance, attempted to jump back onto the deck of the flatboat and landed on his stomach cutting his leg on the side of the boat. Mr. Osterholm further testified that the vertical distance between the flatboat deck and the barge deck was approximately 8 to 10 inches.

Mr. Osterholm testified that he did not instruct Mr. Cormier to leave the flatboat and that Mr. Cormier jumped before Mr. Osterholm had the chance to push the bow of the flatboat up to the port side of the barge.

On page 72 of his deposition, Mr. Osterholm testified that after the incident Mr. Cormier was transported to the Saratoga bunkhouse facility where first aid was administered, at which time Mr. Osterholm completed a Saratoga Resources Accident Report form.

Mr. Osterholm showed Mr. Cormier the text of the report on his computer screen prior to printing. Mr. Osterholm asked Mr. Cormier if he agreed with his comments, obtained consent from Mr. Cormier, then printed the form which Mr. Cormier signed.

The Accident Report form states *"Beaux jumped off the flatboat and onto the M&M 102. He was falling back so he jumped back onto the flatboat, hitting his left leg on the side of the boat and gashing it."*

On page 21 of his deposition, Mr. Levasseur testified that due to the elapsed time since the incident he does not remember the events clearly.  However on page 22 of his deposition, Mr. Levasseur testified that Mr. Osterholm arrived in the flatboat to transfer Mr. Cormier between the Tank Battery No. 13 Platform and M&M 102 barge.

Mr. Osterholm pulled the flatboat up to the bow of the M&M 102 barge so that the boat and the barge were bow to bow. Mr. Levasseur did not hear Mr. Osterholm instruct Mr. Cormier to get off the boat at that time.

Mr. Levasseur testified that he did not know what happened after the flatboat pulled up to the bow of the barge. He saw Mr. Cormier go down, but not clearly enough to see how he stepped onto the barge.

After the incident, Mr. Levasseur saw Mr. Cormier kneeling on the fore deck of the flatboat. He estimated the difference in vertical heights between the barge and flatboat to be approximately one (1) foot.

Also, we note that on page 81 of his deposition, Mr. Cormier testified that he did not complain to Mr. Levasseur or Mr. Osterholm about any mishandling of the flatboat.

As testified on page 47, subsequent to the alleged incident of November 30th 2014, Mr. Cormier continued to carry out his duties as a Wireline Helper which involved, chipping, painting, cleaning, climbing ladders and well head trees, slugging off well head caps with sledge hammers, hooking up wireline tools, opening and closing valves with a 20-inch pipe wrench and conducting other similar strenuous tasks.

Mr. Cormier testified, on page 87 of his deposition, that approximately 1-1/2 to 2 weeks after the alleged incident, he experienced discomfort in his lower back and tingling in his legs, but he did not do anything about it.

Mr. Cormier subsequently worked for M&M Wireline until the end of March 2015, a period of approximately 3-1/2 months until his leg allegedly gave out on two (2) occasions while working. Mr. Cormier did not complain during that three and a half month period that he could not do his job.

On Page 94 of his deposition, Mr. Cormier confirmed that he did not go to Abbeville General Hospital during his time off to seek medical attention.  Abbeville General Hospital was located close to where he lived, but instead went first to see a lawyer who then referred him to a doctor.

On page 92, Mr. Cormier testified that he had health insurance through his employer, M&M Wireline, but did not utilize it.

With regards to the flatboat, Mr. Quiram, who is the owner and President of M&M Wireline and Offshore Services, testified on pages 13 and 14 of his deposition, that Saratoga Resources owned and operated the flatboat and that M&M Wireline Services had no control regarding its operation.

Mr. Osterholm, who was a Saratoga Resources employee and who was operating the flatboat at the time of the incident, did not report or take instructions from any person at M&M Wireline Services.

M&M Wireline Services employed Mr. Levasseur to be Captain of the M&M 102, the latter responsible for operations of that vessel and to make sure his assistant Mr. Cormier carried out his tasks in a safe, environmentally sound and efficient manner. Mr. Levasseur was the on-site supervisor who M&M relied upon to ensure that operations and tasks were carried out safely

Mr. Quiram testified, on page 23 of his deposition, that ingress and egress from M&M 102 was a common sense matter, just step on and off.

Mr. Quiram also testified, on page 122 of his deposition, that there had been no previous accidents or incidents aboard M&M 102.

With respect to the report issued by Bob Borison of Total Safety Services dated May 27th 2016, we further comment as follows:

In his Opinion No 1, Mr. Borison states the vertical distance between the foredeck of the flatboat to the deck of M&M 102 was three (3) feet. This comment is evidently incorrect, as the distance measured by the undersigned and as illustrated in the attached photographs is 14 inches. This is also consistent with the testimonies of both Mr. Levasseur and Mr. Osterholm.

Mr. Borison also states that a recessed rung ladder or a Jacobs ladder should have been installed on the sides of the barge so personnel could climb up the sides. Such a small difference in height between the barge and boat deck would make a recessed ladder impractical as well as potentially unsafe.

This arrangement would force a crewmember to crouch down to actually place their feet on the rungs, increasing the chance of getting trapped in a pinch point between the side of the barge and the boat. A Jacobs ladder hung over the side of the barge would also present the same difficulties that a recessed ladder rung ladder would.

It should also be understood that Jacobs ladders have their own inherent problems if not used correctly.

With regard to Opinion No's 2, 3, 4 and 5 of the Total Safety Services report, we further comment as follows:

Mr. Osterholm testified that Mr. Cormier jumped approximately three (3) feet from the flatboat to the barge and Mr. Cormier also signed an Accident Report to that effect.

Jumping on vessels or from vessel to vessel is not a good practice. In fact, the "Deckhands Manual", a publication sponsored by the American Waterways Operators Association in their Responsible Carrier Program, specifically discusses this issue. (see attached)

If Mr. Cormier acted as Mr. Osterholm testified, then clearly Mr. Cormier disregarded all safe industry practices for embarking and disembarking a vessel and did not give Mr. Osterholm the opportunity to push the flatboat firmly up against the side of the barge.

Mr. Cormier jumped from the boat to the barge in a very irresponsible and unsafe manner.

Mr. Borison quotes the following paragraphs from 33CFR :

*1926.605(b) Access to barges.*

*1926.605(b)(2) Unless employees can step safely to or from the wharf, float, barge, or river towboat, either a ramp, meeting the requirements of paragraph (b)(1) of this section, or a safe walkway, shall be provided.*

As noted during our inspection, it is evident that workers could safely step between M&M 102 and the flatboat. Consequently, a walkway would not be required.

When personnel must move between vessels a safe means of access is required and this depends on the situation at the time. If the vertical height difference between the two (2) vessel's decks is larger than that which an average person would be able to easily step up or down without difficulty and without needing to steady themselves, then a gangway or ladder is not required.

If there is a gap between the two (2) vessels, such that personnel could not easily span with a normal step, then again a gangway would be required. If either of these two (2) criteria were exceeded, then a gangway or ladder would be required.

However, from our inspections of the vessels and the depositions of Mr. Osterholm and Mr. Levasseur, it is evident that Mr. Cormier could have easily stepped between the vessels and accordingly a gangway or ladder was not required.

We note that the American Merchant Seaman's Manual, details the following:

*"Chapter XX*
*Safety*

*Safety is the business of all hands. The consequences of neglect of safety measures can be tragic. It is difficult to talk about safety without repeating trite phrases everyone has heard many times, but the fact that more than 50 percent of all accidents aboard ships are caused by slips, trips, and falls, indicates that safety practices are not always observed. Surprisingly, the vast majority of trips and falls occur in good weather, simply because an individual aboard a ship was not using the handrail, was going up or down a ladder two rungs at a time, or was carrying so heavy a load he could not spare a hand for the rail. The old saying taught the apprentice before he went afloat on a sailing vessel still holds true: "One hand for yourself, the other for the ship".*

*No matter how good the new safety equipment, how well written the safety instructions, or how well the mate or bosun check you out on the equipment, if you do not carry out the instructions and use common sense, you are an accident about to happen. Capable, safety-conscious personnel are the best devices aboard a ship. On the other hand, if seaman are careless, foolhardy, or ill trained, their vessel will be an accident trap."*

Opinions

Based on our above analysis of the case in question, we are of the following opinions:

1. We are of the opinion that Mr. Cormier was an experienced deckhand, who should have been able to safely embark and disembark between the flatboat and M&M 102.

2. We are also of the opinion that Mr. Cormier had a responsibility to act in a safe and responsible manner when transferring from one vessel to another.

3. We are of the opinion that Mr. Cormier did not truthfully complete the M&M Wireline Services employment application form and General Physical Form, and thus denied M&M Wireline Services and his direct supervisor the relevant information they needed to ensure that Mr. Cormier was assigned the appropriate tasks when working onboard

4. We are also of the opinion that although Mr. Cormier testified that his back injuries occurred during the incident, such allegations appear somewhat questionable based on the fact that he continued to work for three and a half months after the alleged incident. During this time period he performed the same strenuous duties that he had before.

5. We are of the opinion that the various comments in the Total Safety Services report dated May 27th 2016 have no basis or support, and are misleading for the fact finder.

6. We are of the opinion that the vertical height difference between M&M 102 and the flatboat was to the approximate order of 12 to 14 inches, and that Mr. Cormier could have safely stepped between the vessels without difficulty, had he waited to transfer until the bow of the flatboat was pushed up against the barge.

7. We are of the opinion that the incident is consistent with having occurred as testified by Mr. Osterholm when Mr. Cormier unexpectedly jumped from the flatboat to M&M 102, , as confirmed in the contemporaneous Incident Report signed by Mr. Cormier himself.

Conclusion

In conclusion we are of the opinion that neither M&M Wireline nor Saratoga violated any regulations, requirements or industry standard practices or procedures that led to the incident and alleged injuries to Mr. Cormier on November 30th, 2014.

Finally, we are of the opinion that the incident and alleged injuries to Mr. Cormier could have been avoided by his actions alone, had he followed industry standard safety practices and had he been situationally aware and alert to his surroundings and circumstances.

We reserve the right to amend or supplement this opinion should further information be made available.

Without prejudice,

David H. Scruton
3D MARINE USA, INC.

Martin Gee
3D MARINE USA, INC.

*The opinions expressed in this report are based upon a review of the documentation provided. This report, including the opinions and analyses contained within, is the product of an application of the preparer's experience and knowledge in the context of the material provided in this matter and cannot be applied to other situations or incidents, no matter how similar they may be. Furthermore, this report does not attempt to resolve conflicts, nor is it intended to discredit witnesses or experts, and is produced bearing in mind that it is normal for conflicts to exist between the accounts of witnesses.*

Attachments:  i)     Photographs taken during our attendance on June 1st, 2016
ii)    Excerpts from the Deckhand's Manual
iii)   Chapter XX from the American Merchant Seaman's Manual
iv)    Paper on Stop Work Authority issued by David H. Scruton
v)     Resume (CV) David H. Scruton
vi)    List of Cases in which Expert Testimony was Given During Last Four (4) Year Period – David H. Scruton
vii)   Schedule of Fees – David H. Scruton
viii)  List of Papers Authored by David H. Scruton
ix)    Resume (CV) Martin Gee
x)     List of Cases in which Expert Testimony was Given During Last Four (4) Year Period - Martin Gee
xi)    Schedule of Fees - Martin Gee
xii)   List of Papers Authored by Martin Gee

i)   Photographs taken during our attendance on June 1st, 2016

**3D MARINE**



Photograph-01.jpg



Photograph-02.jpg

Our Ref. No. HAR/12395/DHS/16L

**3D MARINE**



Photograph-03.jpg



Photograph-04.jpg

**3D MARINE**



Photograph-05.jpg



Photograph-06.jpg

Our Ref. No. HAR/12395/DHS/16L

**3D MARINE**



Photograph-07.jpg



Photograph-08.jpg

**3D MARINE**



Photograph-09.jpg



Photograph-10.jpg

**3D MARINE**



Photograph-11.jpg



Photograph-12.jpg

Our Ref. No. HAR/12395/DHS/16L

**3D MARINE**



Photograph-13.jpg

ii)   **Excerpts from the Deckhand's Manual**

# the Deckhand's Manual



## an Orientation and Training Manual

## SAFETY RULES

1. Always wear your work vest on the tow, and at any other time you are exposed to falling overboard.

2. Don't wrestle, "skylark" or "clown around" on the boat or barges. Horseplay doesn't pay.

3. Sit down when riding in a yawl.

4. Do not run on the barges. Never jump from barge to barge or jump over timberheads.

5. Make sure that all gangways on the boat and the barges are clear and swept clean. Keep cargo cleaned off walkways on the boat and the barges. Clean up oil and grease spots on the decks. Use "stay-dri" on oil spills and de-icing chemicals on ice and snow. In emergencies, sprinkle sand on icy or slippery spots on the decks.

6. Keep loose gear, wires, ropes, ratchets, etc. stowed neatly on the boat or barges.

7. When walking on the barges in tow, always walk the middle gunnel between the barges and not along the outside gunnel.

8. Don't go on the tow alone at night. If it is necessary to go alone, advise the pilot before going out on the tow.

9. Keep all hatch covers and pump box covers "dogged" down tightly.

10. Avoid hanging and/or storing gear so it obstructs the walkways.

11. Keep alert when maneuvering barges in a lock. Always watch for holes between barges.

12. Life lines and guard rails should be kept taut and intact. Do not hang on life lines around the boat.

13. Never stand in the "bight" of a line at any time.

14. Stand in the clear when handling a line on a timberhead or with the capstan. When possible have another man back you up off the line.

15. Stand clear of lines or wires that are under a strain. Do not straddle wire when tightening a ratchet.

16. "Watch the Bump", get down on your hands and knees and hold on to a timberhead or barge coaming. Pass the word, "Watch the Bump".

17. Wear goggles when chipping, grinding or scraping.

18. Do not jump into the river to "swim" a line ashore. Use the yawl. Swimming off the boat or barges is prohibited.

19. Do not lean against the lock wall when standing on a barge in a lock.

20. Wear proper clothing, long pants and long sleeves shirts. Use the proper Personal Protective Equipment, like gloves, safety toe work shoes, and your work vest. Dust mask are good when painting or scraping. Hearing protection is require when ever you are in the engine room.

21. Know the safe way to perform your job. When in doubt, ask your supervisor for advise or training.

22. When not in use take cranks and crank wheel out of the hand winches.

20

# SAFETY RULES

23. Set a ladder securely on a level surface. Tie off the top or have another deckhand hold the ladder before you climb. Inspect for broken or cracked rungs.

24. When working around machinery in operation, check your clothing for loose ends, so you don't get pulled into the machinery.

25. Carry the load on your outside shoulder when walking along the outside gunnel of a barge.

26. Do not lean over the edge of the boat or barge to grab a line. Use a pike pole.

27. Do not make a line fast to a timberhead when there is a line already there. Clear the timberhead before using it.

28. Place ratchets on the barges so they will tighten inboard.

29. Observe "NO SMOKING" signs and rules. Never smoke in (A) bed; (B) on the deck of petroleum or flammable cargo barges; (C) in paint lockers; (D) on oil docks; (E) observe all NO SMOKING SIGNS.

30. Have a safe place for all cutting utensils (rope & pocket knives, axes, galley knives) and keep them in place. Never use a dull knife for cutting.

31. Keep your hands and feet from between the barges in tow and from between the towknees and the barge.

32. Never work around the edge of the boat or barge with your back to the river.

33. Know the location, and how to use all the fire extinguishers and fire stations.

34. When possible, all wires and lines should be handled from the line deck of a barge.

35. The use of illegal drugs, drinking or possession of alcoholic beverage while on the vessel is prohibited. Violation of this rule is grounds for termination.

36. Familiarize yourself with all whistle and alarm signals.

37. Keep fingers from between timberhead and wires when placing or throwing off face wires.

38. Possession of firearms aboard the boat is prohibited.

39. Keep Alert - avoid situations where you are exposed to danger.

40. Report faulty equipment or tools to your supervisor.

41. Always lift properly by bending your knees and lifting with your legs not your BACK. If the load is top heavy, ask for help.

42. Report all injuries immediately.

43. Avoid walking on barge covers.

44. Always step over - not on manhole covers.

21